IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

NASSAU LIFE INSURANCE CO.,

     Plaintiff,

v.                                 CASE NO. 1:21-cv-126-GRJ

KELLI HILSCHER HYNES and
KATHERINE G. SOLOMON,

     Defendants.
_____/

KELLI HILSCHER HYNES,

     Cross-Plaintiff,

v.

KATHERINE G. SOLOMON,

     Cross-Defendant.
_____/

## **MEMORANDUM OPINION**

The Court conducted a bench trial on April 25, 2022, ECF No. 51.

The parties consented to jurisdiction by a magistrate judge for all matters

including trial and the entry of judgment.  *See* ECF No. 28.

At trial, the Court heard testimony from nine (9) witnesses and

reviewed twenty (20) exhibits admitted into evidence by stipulation of the

1

parties.  The sole issue for the Court to resolve is whether on February 10, 2021, Martin Solomon ("Martin") lacked the mental capacity to change the beneficiary of his life insurance policy from his adult daughter, Cross-Plaintiff Kelli Hynes ("Kelli") to his second wife, Cross-Defendant Katherine Solomon ("Katherine").

After careful consideration of all the evidence in this case as well as the parties' post-trial submissions, and for the reasons discussed below, the Court concludes that Hynes failed to rebut the presumption that Martin was mentally competent at the time he executed the change of beneficiary form in favor of Katherine.

## I.  Uncontested Evidence

The insurance policy at issue in this case was purchased by the insured, Martin Solomon, and his first wife, Elaine, from Confederation Life Insurance Company in 1988 (policy #5743913).  ECF No. 1 ¶ 6. The policy provided a $50,000 death benefit.  *Id*. ¶ 7.  The policy was later assumed by Nassau Life Insurance Company.  *Id*.   Relevant to this case, on July 25, 2012, Martin changed the sole beneficiary of the life insurance policy proceeds to his biological daughter Kelli after his wife Elaine predeceased him.   Tr. Ex. 2.

Seven years later, in May of 2019, Martin suffered a serious stroke

that required hospitalization and rehabilitation therapy.  The following month, Martin married his live-in girlfriend Katherine at the Cross City, Florida Nursing and Rehabilitation Center where he was recovering from his stroke.  *See* Tr. Ex. 9.  Katherine and Martin had been together since 2012.  After Martin was released from the rehabilitation center, he returned home with Katherine, who quit her job to take care of him.

On August 28, 2019, Martin executed a Last Will and Testament ("Will"), once again naming Kelli as the sole beneficiary of the life insurance proceeds. Tr. Ex. 3 at 3.  The following year, on November 9, 2020, Martin executed a Durable Power of Attorney ("PoA"), designating Katherine as his attorney-in-fact and agent, empowering her to take all necessary actions for his "health, safety and care."  Tr. Ex. 4 at 1.  The Will and the PoA were prepared by the same attorney and were witnessed and notarized.

On February 10, 2021, Martin executed a change of beneficiary form, naming Katherine as the sole beneficiary of the $50,000 life insurance proceeds, thereby depriving Kelli of that benefit upon his death.  Tr. Ex. 5. Three witnesses were present when Martin signed the change in beneficiary designation:  Katherine, Katherine's daughter, Patricia Patrick, and Ed Senuik (boyfriend of Katherine's daughter).

3

## II.  Contested Evidence

Kelli submitted the following evidence in support of her position that Martin lacked the mental capacity on February 10, 2021, to change his beneficiary designation from her to Katherine.

Tasha Solomon ("Tasha"), Kelli's sister-in-law,[1] testified that she and her husband, Stephen, relocated from South Florida in November of 2019 to be near Martin after his stroke because Katherine was having trouble caring for him.  Tasha testified that she had regular contact with Martin in the months, weeks, and days prior to and after February 10, 2021, and that she did not believe in her heart that Martin would deprive Kelli of the insurance proceeds he intended her to have if he had been mentally competent. Tasha also questioned whether Martin had the mental capacity to consent to his marriage to Katherine in June of 2019.  She recalled having several conversations with Martin in which Martin said he would never marry again even after he and Katherine had moved in together. "There wasn't a need for it," he said.

After Martin's stroke, Tasha said she was surprised to learn from a Facebook post that Martin had married Katherine.  On February 11, 2021,

---

[1] Tasha is married to Kelli's half-brother, Stephen, who also testified at the trial.

the day after the change in beneficiary form was executed, Tasha visited Martin to give him a birthday card, balloons, and a chocolate bar, but, according to Tasha, Martin did not react or appear to recognize her during her birthday visit that day.  Based upon her interactions with Martin, the Tasha testified that Martin was simply unable to have a conversation and lacked the mental capacity to make any decisions whatsoever after his 2019 stroke.

Martin's son, Stephen Solomon ("Stephen"),[2] also testified that the stroke had a negative impact on Martin to such an extent that attempts at conversation with him were impossible —"it's like talking to a wall."   After the stroke, Stephen explored getting a power of attorney for his father but decided the effort would be useless.  According to Stephen, Martin was unable to talk, and Stephen did not think his father could "write anything". Further, in Stephen's view, Martin lacked the mental capacity in 2019 to execute the Will.  Stephen also confirmed that remarriage was not in the cards as far as his father was concerned— "There's no reason for it."  He, too, was surprised about his father's 2019 marriage to Katherine, especially since neither he, his wife, Tasha, nor Kelli had been invited to attend the

---

[2] Stephen is Kelli's half-brother. He is married to Tasha, who also testified at trial.

5

wedding.[3]  As for the particular date in question, February 10, 2021,

Stephen did not see Martin anymore."

Kelli, too, testified that Martin was never quite the same after his

stroke.  And even though Kelli lives in Texas and was unable to visit Martin

in Florida during the relevant time period due to COVID-19, Kelli spoke with

Martin by telephone on occasion.  During those telephone conversations,

Kelli testified that Martin lacked clarity of thought and had difficulty

speaking.  In her view, Martin was not competent to make any decisions

after his stroke.

As for the 2019 Will, Kelli testified that she honestly believes Martin

could not sign his name at that time.  Kelli also testified that she attempted

to speak with her father by telephone the day of his birthday, February 11,

2021, but he did not want to talk with her then. Kelli was able to speak with

Martin by phone soon after his birthday, and Martin told Kelli that he loved

her.

In support of Katherine's position that Martin was mentally competent

---

[3] Katherine testified that Martin did not want her to invite his adult children to the
wedding because: "He was a little ticked off at them." Katherine's daughter testified that
the reason Martin did not want his children at the wedding was because he was angry
at the boys for destroying his welding business, and he hardly ever talked with his
daughter. Katherine's daughter and her boyfriend, Ed Senuik, did attend the wedding.

on February 10, 2021, Katherine presented the testimony of several disinterested witnesses, who testified about Martin's mental competency and condition after his stroke in general and on February 10, 2021, in particular.

Malisa Roberts ("Roberts"), a notary public and paralegal, testified that Martin asked the law firm where she worked in Dixie County, to draft both the 2019 Will and the 2020 PoA. Roberts testified that she read both documents aloud to Martin and asked him if they were what he wanted before he signed them.  According to Roberts, Martin acknowledged that he understood what he was signing. Reading documents aloud to clients is a standard practice of the law firm.  At both signings, Roberts testified that she had no concern that Martin lacked understanding about what he was doing.

Licensed physical therapy assistant, Suzanne Rogers ("Rogers") testified that she provided Martin with physical therapy services in his home "on and off" from 2020 to 2021 (one-and-a-half years).  During those sessions, she observed that Martin was able to walk, sign his name, respond, follow instructions, and make decisions.  Rogers further testified that Martin was stubborn and would not do anything he did not want to do—a character trait confirmed by several witnesses.

7

The three witnesses who were present when Martin executed the change in beneficiary designation on February 10, 2022, all confirmed that Martin knew what he was signing at the time, that he intended to change the beneficiary to Katherine, and that he knew that the change would result in Katherine receiving the proceeds upon his death. All three witnesses further testified that no one pressured Martin into making the change.

Ed Senuik ("Senuik") testified that he was present when Martin signed the change in beneficiary form. According to Senuik, before Martin signed the change in beneficiary form Senuik asked Martin if he was sure he wanted to change the beneficiary to Katherine. Senuik testified that Martin confirmed that is what he wanted to do when he nodded yes. Senuik also asked Martin again if he was sure he wanted to sign it. This time, Martin grabbed the form and signed it. Senuik then signed the form as a disinterested witness. Martin certified that the form was modified by him, the "Owner." Tr. Ex. 5.

Katherine testified that the reason Martin changed his beneficiary is because she "was the one taking care of him and his kids never participated in it at all."

Sheila Frierson ("Frierson"), a long-time neighbor and registered nurse, testified that three days later she observed Martin walking in his

8

driveway using a walker to get some exercise. She said that Martin appeared to her to be mentally alert at that time.  As further confirmation of Martin's mental capacity Frierson testified that Martin remembered to wish her a happy birthday and they exchanged birthday greetings that day as their birthday dates coincided.  As corroboration that Martin could write, Frierson testified that the next day, on Valentine's Day, Martin scribbled "I love you, Kathy" on a chalk board that he used to practice his writing skills after his stroke.  Tr. Ex. 13.

Katherine also presented testimony from her daughter confirming that even after the stroke, and as recently as two weeks before his unexpected death on May 15, 2021, Martin enjoyed fishing. The testimony was highlighted by a photograph of Martin fishing at that time.[4]  *See* Tr. Ex. 18.

### III.  APPLICABLE LAW

It is the general, if not universal, rule that if, at the time he or she attempted to change the beneficiaries under an insurance policy, the insured was mentally incompetent, the attempted change is ineffective, and the original beneficiary has such an interest in the proceeds as will entitle him or her to avoid the change and recover under the policy.  4 Couch on

---

[4] Martin's cause of death was urosepsis brought on by a urinary tract infection.  Tr. Ex. 6.

Ins. § 60:69 Incapacity of insured (2021).  The incompetency must have existed at the time of the attempted change to invalidate it.  *Id*.

Under Florida law, an individual is presumed to be competent to enter into a contract, and "[t]he burden of overcoming the presumption rests on the party who challenges the validity of the contract."  *John Knox Village of Tampa Bay, Inc. v. Perry,* 94 So.3d 715, 717 (Fla. 2d DCA 2012); *see also Dukes v. Dukes*, 346 So.2d 544, 546 (Fla. 1st DCA 1976), Boyer, J. concurring ("Florida recognizes a presumption of sanity and mental competence of a person at the time of the execution of the instrument.").  Because it is Hynes who is challenging the insured's mental capacity on February 10, 2021, the burden to overcome the presumption lies with her.

In an interpleader action concerning life insurance benefits, the Court looks to state law.  *Davis v. Prudential Ins. Co. of Am*., 331 F.2d 346, 348 (5th Cir. 1964).  Under Florida law, "the beneficiary of [insurance] proceeds is determined by looking only to the insurance contract."  *Cooper v. Mucitelli*, 682 So.2d 77, 78 (Fla. 1996).[5]  Florida also recognizes a

---

[5] Kelli relies on Florida law governing *inter vivos* gifts to support her argument that she and not Katherine is entitled to the insurance proceeds. Yet, to constitute an *inter vivos* gift, the donor must have relinquished control of the insurance proceeds by way of a judgment or settlement agreement.  *See Lincoln Nat'l Life Ins. Co. v. Brophy*, 2009 WL 10670858, *4 (M.D. Fla. 2009); *Cadore v. Cadore*, 67 So.2d 635 (Fla. 1953).  In this case, there is no evidence that Martin lost the right to change the beneficiary of the insurance proceeds after February 10, 2021.  In other words, Martin never relinquished

presumption of sanity and mental competence of a person at the time of the execution of an instrument. *Shaefer v. Voyle*, 102 So. 7 (Fla. 1924); *Travis v. Travis*, 87 So. 762 (Fla. 1921); *Beatty v. Strickland*, 186 So. 542 (Fla. 1921). The burden of overcoming such presumption rests upon the party attacking the sanity or mental competence at the time of the execution of the instrument. *John Knox Village,* 94 So.3d at 717; *see also Dukes,* 346 So.2d at 546.

Mere physical feebleness or mental weakness will not authorize a court to set aside a contract or other executed document on the ground of mental capacity unless the evidence demonstrates that such mental or physical weakness amounted to an inability to comprehend the effect and nature of the transaction. *Murrey v. Barnett Nat'l Bank of Jacksonville*, 74 So.2d 647 (Fla. 1954); *Davis v. Wigfall*, 70 So.2d 908 (Fla. 1954).

To overcome this presumption, the challenger must establish by a preponderance of the evidence that the testator lacked the ability to

> mentally understand in a general way (1) the nature and extent of the property to be disposed of, (2) the testator's relation to those who would naturally claim a substantial benefit from the will and, and (3) general understanding of the practical effect of the will as executed.

---

his rights to Kelli, so there was no *inter vivos* gift.

*In re Estate of Edwards*, 433 So.2d 1349, 1350 (Fla. 5th DCA 1983). Not only is the burden to overcome the presumption high, courts uphold an individual's directive on the disposition of his money and property "wherever possible." *In re Dunson's Estate*, 141 So.2d 601, 604 (Fla. 2nd DCA 1962) (citations omitted).

## IV.  DISCUSSION

The evidence before the Court supports by a preponderance of the evidence that on February 10, 2021, Martin understood, at least in a general way, that he was giving the $50,000 proceeds of his life insurance policy to Katherine upon his death. This is not surprising because the evidence established that Katherine, his wife of nearly two years, was the individual who was taking care of Martin and that Martin wanted to take care of her.  Accordingly, the Court presumes that Martin had the mental capacity to change his beneficiary on February 10, 2021.

Kelli's evidence regarding Martin's general mental state after his 2019 stroke is not sufficient to rebut that presumption.  Kelli relies upon her own testimony that she did not think Martin was competent when he changed the beneficiary (even though she had no in-person contact with Martin at that time), the testimony of Stephen that Martin could not converse at all after his stroke (although, he, too, did not see Martin on or near February

10, 2021), and the testimony of Tasha that she did not believe Martin would have changed his beneficiary unless he was not competent to do so. Even though Tasha visited Martin the day after the change in beneficiary was executed, both sides presented testimony that Martin had "good" and "bad" days after his stroke. Consequently, testimony concerning Martin's condition the day after he signed the change in beneficiary form for his life insurance policy, while circumstantially relevant, is, nonetheless, insufficient to rebut the testimony from three witnesses, each of whom were present the day Martin changed the beneficiary of his life insurance to Solomon.

Furthermore, while Kelli presented testimony that Martin was not responsive when communicating with Kelli, Stephen or Tasha the Court finds that while there is no question Martin suffered communication issues as a result of his stroke that is insufficient to establish that Martin was mentally incompetent. There was ample trial testimony from other witnesses that Martin was selective about whom he chose to converse with at times depending on his mood. Further, there was testimony that Martin had a falling out with Stephen, resulting in Martin installing video cameras inside his home to capture Stephen's uninvited intrusions. Thus, even assuming Martin did not communicate with Stephen, as his son testified,

13

the Court concludes the lack of communication between Martin and Stephen was more likely than not a function of a strain in the father-son relationship. Stephen's testimony that Martin was not able to communicate stands in stark contrast to the testimony of other witnesses, each of whom testified that Martin regularly was able to communicate with them. For example, Rogers, the physical therapist, testified that during the year and a half she cared for him Martin was alert, conversant and communicated with her. Martin's neighbor, Frierson, who is a registered nurse, confirmed that she observed Martin walking in his driveway and he was able to speak to her about their birthdays, which were around the same date. This testimony underscores through disinterested witnesses that Martin was conversant and aware of his circumstances around the time in question.

Additionally, although the Court has no doubt Tasha was sincere in her belief that Martin would not have knowingly changed the beneficiary on February 10, 2021, her testimony is at odds with Martin's other actions. For example, Martin obtained a marriage license and married Katherine at a wedding ceremony in 2019 as confirmed by disinterested witnesses. Martin also executed at the lawyer's office in 2020 a PoA naming Katherine as his agent. Martin's knowing execution of the PoA was confirmed by the paralegal who read the document to Martin and witnessed it. And when

14

Martin executed the change in beneficiary in February 2021, Sanuik testified that he expressly asked Martin if he wanted to change the beneficiary to Katherine. Martin acknowledged that was what he wanted to do.

In the absence of a witness who could testify that Martin did not have the requisite state of mind at the time he executed the change in beneficiary form the Court must rely upon the testimony of the three witnesses each of whom were present when Martin executed the change in beneficiary form. Each of the three witnesses testified that Martin knew what he was doing and confirmed that he wanted to change the beneficiary of the life insurance proceeds to Katherine. And it is not surprising that Martin intended to give the life insurance proceeds to his then wife Katherine. There was ample testimony establishing that Martin loved his wife, Katherine, and wanted to provide for her after his death in appreciation for Katherine taking care of him for three years after his stroke.[6]

While there is no serious debate that Martin's 2019 stroke negatively

---

[6] Frierson attended Martin and Katherine's wedding.  Martin told Frierson just before the ceremony: "Sheila you know I loved Elaine, but Katherine has been so good to me.  I want to marry her and take care of her."

impacted him and required care and rehabilitation, the Court concludes that the evidence of Martin's decline after the stroke, while unfortunate, is not sufficient to rebut the presumption—and the testimony of the witnesses who were present when Martin executed the change in beneficiary form— that Martin executed the form and that he had the mental capacity to understand what he was doing by changing the beneficiary to his life insurance policy.

Accordingly, the Court concludes that Katherine Solomon is the lawful beneficiary of the life insurance policy and, therefore, is entitled to the proceeds of the life insurance policy that are currently held in the registry of the Court.

## V. CONCLUSION

Upon due consideration, it is **ORDERED** that:

1. The *Clerk* must enter judgment stating that "after a non-jury trial the Court rules in favor of Cross-Defendant Katherine Solomon on her cross claim against Kelli Hynes and finds that Katherine Solomon is the lawful beneficiary of the Nassau Life Insurance policy and is entitled to the proceeds of the life insurance policy.  Costs may be taxed according to law."

2. The **Clerk** must then issue a check from the court registry payable to Katherine Solomon in the amount of $50,641.00, the current amount of the proceeds deposited into the court registry by Nassau Life Insurance Co and then forward the check to counsel for Katherine Solomon.

3.   After issuance of the check payable to Katherine Solomon the
     **Clerk** must dismiss this case and terminate any pending
     motions.

**DONE AND ORDERED** this 27th day of May 2022.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge